

Charles F. Claiborne,

Judge.

WESTERN ELECTRIC CO.

VS

A. MARX & SONS

No. 7935

January 24th, 1921.

WESTERN ELECTRIC CO.

VS                                    No. 7935

A. MARX & SONS,
        Appellant:

        Appeal from Civil District Court, Hon. H. C.
Cage, Judge.

                CHARLES F. CLAIBORNE, JUDGE.

        Plaintiff claims $480.91 as the balance due on the
price of 20,000 lbs. of cable core sold by it to the defendants,
according to the following bid:

                        "New Orleans, La., 6 - 19 - 17.
Western Electric Co.

                Attention Mr. H. F. Bethea

Gentlemen:

        As per your request, we herewith beg to submit
you the following prices, for acceptance on the 20th
inst, covering lot of Scrap Metals and Scrap Iron, on
hand at Warehouse Cumberland Telephone & Telegraph Com-
pany, this City, to be handled subject to usual terms
and conditions.

        Approximately 60,000 lbs. of Clean Telephone
Cable Lead, price $11.73 per one hundred pounds;

        Approximately 13,000 lbs. of Telephone Cable,
with Copper filler, price $13.73 per 100 lbs.;

        Approximately 7,000 lbs. of Clean Heavy Copper
wire, price $29.73 per 100 lbs.;

        Approximately 20,000 lbs. of "Cable Core" (Copper
filler with paper insulation) price $23.78 per 100 lbs.;

        Insulated Copper Wire - one half the price of
Clean Copper wire

                x x x x x x x x x x x x x x

                        Yours very truly,

                "Signed"        A. Marx & Sons "

        The defendant admitted having purchased scrap metal
from the plaintiff, but denied any indebtedness.  Its defense
is contained in the following averment:

        (4)  "In answer to fourth paragraph of the petition,
                290

your defendant admits that certain scrap material, etc., was delivered to it, but denies that the same was of the kind and quality which was agreed to have been delivered by plaintiff to defendant. Further answering said fourth paragraph, defendant avers that it purchased from plaintiff material aggregating approximately $18,000; that it paid approximately $12,000 of said amount at one time, and after discussion as to balance due, and adjustment of differences, paid to the plaintiff, the entire balance due".

To make the defense clearer, it seems that each individual wire making part of the "Cable Core" was covered with paper to secure insulation; while the aggregate of the individual wires composing together the cable as a whole was surrounded or bound or held together with cotton cord as a binder. A segment of the cable offered in evidence shows that fact. The defendants contended that they were entitled to a deduction of 2½% on account of the weight of this cotton cord, and to 1½% for the labor of removing or burning it off; amounting to $254.93. In other words, they claimed they had bought the copper net weight and not gross weight. Whether the defendants are entitled to this deduction of 4% is the first question presented in this case. The second question is whether the payments made by the defendants were in full, or ~~on account~~. in partial payment.

There was judgment for plaintiff as prayed for, and the defendants have appealed.

H. F. Bethea, traveling salesman in South Carolina for the plaintiff company, testifies:

On June 19th, 1917, he was located in New Orleans and had charge of plaintiff's warehouse and office; they had on hand seven car loads of various kind of scrap metal; they called for bids on the same; they received from the defendant the bid mentioned above dated June 19th, 1917; upon receiving this bid they wrote to defendants the following letter:

" June 21st, 1917

A. Marx & Sons

Gentlemen, Confirming telephone conversation to-day

relative to quotation submitted for certain junk at 929 Howard Avenue on June 19th, we accept your prices for this junk material as follows: Lead, 11.73 cwt.; cable, 13.73; copper, 29.73; cable core, 23.78; insulated copper wire, 14.865 & c .

"In your quotation you make reference to clean telephone cable and heavy copper. We are disregarding this specification, but assume that you accepted it and made your bid just as the material appears in our warehouse".

x  x  x  x  x  x  x  x  x  x  x  x  x  x

This material will be sold under the above conditions with further provision that it be weighed over the public certified scales & c.

This letter the defendants answered as follows:

"New Orleans  6-22-17

Western Electric Co.

Gentlemen: We have yours of the 21st inst. accepting our offers on Junk, for which we beg to thank you. However, please understand that the price on the scrap iron is $17.75 per ton, and not per 100 lbs. We have no objection to weighing the material over the I. C. Public Scales & c".

The witness knows by hearsay that Marx inspected this junk before he put in any bid; after witness had delivered the junk, he sent the bill to be collected; he was informed that the defendants would not pay it; he immediately went down to see Marx who told him

"that we had delivered cable core to him with cloth wrapper between and that he had bought - he told me that we had delivered a cloth insulated cable core with cloth insulation instead of cable with paper insulation, and that he would make such deduction on account of not having gotten what he bought";

the dispute arose over that part of the bid reading:

"approximately 20,000 of cable core (copper filler with paper insulation) price $23.78 per 100 lbs.";

the defendants got

"cable core with copper filler, with paper insulation,"
good cotton binding twine holding it in position to get
the lead sheath on it";

Mr. Marx took the position that that cotton binder holding that
copper core and paper insulation together was not a copper cable
core with paper insulation, and that he did not buy that material
& c; the witness and Mr. Gleason, an agent of the plaintiff com-
pany, called at the office of Marx; after much conversation, they
received a check from Mr. Marx for the entire amount less $480.91
which Mr. Marx claimed was the amount that was to be adjusted
or in question;

"Mr. Gleason drew over to Marx' desk and took our bill
for the entire amount - the bill which we had presented
to Mr. Marx and with pen and ink, receipted the bill as
partial payment of the total face value of the bill;
there was a conversation of some several minutes as to
whether it should be written in that way";

there was much conversation following as to whether the $480 was
justified or not; they left Marx' office at about twelve o'clock,
Mr. Gleason informing Mr. Marx that he would come back that even-
ing and ask him to reconsider the matter as he was anxious to
clpse it; when they called back in the afternoon there was noth-
ing accomplished; Mr. Marx offered to compromise; Mr. Gleason
offered Marx $25 which he refused to take; the partial receipt
of the bill was the only condition on which Mr. Gleason accepted
the check; even admitting Mr. Marx' contentions the difference
was only $254.93 and not $480.91; he undertook to deduct in ad-
dition the drop in the price of the copper from the day of sale
to the day on which he gave the check.

H. B. Wathal is a telephone engineer; has handled a great
many shipments of wires and copper fillers which were to be sold
as junk; is familiar with cables and cable cores; a man who had
agreed to buy cable core, copper filler with paper insulation
would get what he had bargained for if he was tendered the cable
core in this case; there are three classes of cable cores; the
first like the one in suit; the second with a thin strip of pa-
per around it as a binder with a few wrappings of twine; and the

293

latest type, a considerable piece of paper and no twine; mass for mass, the paper binder is heavier than the twine binder; the filling and isolation is not generally sold stripped of all binding because it makes no difference in the value of it.

G. W. Swanton was employed by plaintiff in 1917; there was no cable core insulated with anything else but paper delivered to Mr. Marx; the cable core in suit is copper wire with paper insulation.

Edwin Marx sworn for the defendants says that he has been in the junk business since 1895;

> "the material that he bid on was cable core with paper insulation and what was delivered to him was cable core laid in paper-cord binder, and also copper core with paper insulation, with paper and cord binder";

when they buy materials they make a record of just what they will weigh after the foreign material is removed; in the case of cable core with paper insulation they figure a loss of one-half of one per cent by burning off the paper; he calculated a loss of $2\frac{1}{2}\%$ by taking off the paper and cord binder in this case or a loss of 522 pounds; the charge of $1\frac{1}{2}\%$ is usually made for cleaning the copper free of the paper and cord binder; there is also a charge of 3/4 of a cent a pound for depreciation in value from the time the goods were received by them and the time the plaintiffs accepted their check; by copper filler with paper insulation is understood in the trade to mean absolutely without any paper or cord binder; he offered to pay the plaintiffs bill less $480.91; they refused to accept it; he offered to submit the matter to arbitration which they refused; Mr. Bethea and Mr.Gleason came to his office and after severl hours wrangling he told them that they owed him the entire bill or nothing, and that unless they were willing to take the check he offered, which was the amount of their bill less $480.91, he would return the cable.

> "He (Gleason) got very excited and picked up the statement he had made and the check and walked out of the office and the next thing he heard about it, he had the check certified and had used it. He considered that this closed the transaction, until about two weeks later

294

he had a letter from him reopening the matter & c; he has bought the same class of materials from the plaintiff on previous occasions and made the same deductions claimed by him, but cannot remember any particular instance; after the cable was delivered to them the price of copper went down; they did not inspect the cable before bidding on it; they bid on material so often that they do not find it necessary to inspect the goods; there never was any bill received; he would not have accepted a receipted bill, unless it had been receipted in full, and he is sure from the way Mr. Gleason talked and acted that he would not have receipted it in full.

The first contention of the defendants in their answer that the material delivered to them was not of "the kind and quality" which they purchased, is refuted by the segment of the "cable core" introduced in evidence, and by the testimony of the witnesses who swear that the segment corresponds with the description contained in defendants' bid of "cable core", copper filler with paper insulation"; we have examined the segment and find that each wire is insulated with paper and that the whole is held together with a binding of cotton cord. But the insulation of the several wires, and the binding of the aggregate of the wires to form a cable, are different propositions. The defendants say that they understood that the binding was to be of paper. But it does not appear that there was anything said about the material of the binding, _eo nomine_. But what the plaintiffs intended to sell to the defendants was made unmistakable to them by the correspondence that followed the bid. When defendants specified in their bid for "clean telephone cable", they were quickly informed by plaintiff by letter that "they disregarded this specification" and assumed that the defendants made their bid "just as the material appears in our warehouse" and that the material would "be sold under the above condition". These remarks covered every part of the bid. If, therefore, after receipt of this letter, the defendants persisted in their bid, they have only themselves to blame if the cable delivered to them did not meet their expectations. C. C., 2521 (2497).

But are the defendants entitled to a deduction on account

295

of the extra weight of the cotton cord as a binder? They do not contend that they would be entitled to a deduction if the binder had been of paper. There is no reason that they should, because the binder was of cotton. They had seen, or should have seen the "cable core" before closing the bargain. Besides, the testimony is that paper binding is sometimes heavier then cord binding. But the defendants seem to have provided for the weight of the binding; for while they bid $29.73 for "clean heavy copper wire", they bid only $23.78 for the next item of "cable core" with paper insulation.

Having found that the defendants are not entitled to a deduction on the price of cable core bound with cotton cord, we are bound to conclude that they cannot claim a deduction for the greater labor, if any, of removing the cotton cord.

For the same reason they are not entitled to any indemnity for depreciation in the value of copper. From the time the copper passed the scales and was delivered to the defendants they became the owners of it, and were bound to stand any loss that might happen to it. C.C. 2467-2468-

The defendants carried the burden of proving that the plaintiff accepted their check in full payment. C. C., 2232 35A1038-25A182-243-24A200-23A84-8A88.4 n.s.b. (2229); 22 A., 106; 2 H. D., 1150, 4, No. 6. The testimony of one of the defendants is the only evidence on that point. Even if we assumed that it was true, we could not conclude, as a question of law, that it established a payment in full, or estopped the plaintiff from claiming the amount in controversy here. But that testimony is contradicted by the testimony of Bethea who says that the plaintiff gave the defendants a receipt on account. It is not necessary for us to decide who testified the truth on this point; but Bethea's testimony suffices to cast a doubt on Marx' testimony, and to destroy its probative force. Marx has not then met the burden of proof nor made his defense certain.

The judgment of the District Court is therefore affirmed.

January 24th, 1921.